In our first case I'd like to welcome Judge St. Eve to the court. This is her first argument and we are delighted to have her with us. Thank you. Our first case this morning is Karum Holdings v. Lowe's Company. Mr. Byman for the appellant. Thank you Judge Barrett, Judge Bauer, Judge St. Eve. This case is before you from the dismissal of Karum's case as the consequence of a discovery sanction for what the court found was a failure to follow Rule 26. There are other issues that I will address as time permits or as the court's questions direct me, but I'd like to focus on that issue since it's the one that kept us from going to trial. Did the court properly exclude our damaged testimony thereby resulting in a dismissal? The parties posit this issue somewhat differently. Lowe's posits it taking as a given that Rule 26 was violated and so they posit the issue as simply did the court properly exercise discretion in selecting a sanction and imposing it. We pose the question somewhat differently. We think that first there is a de novo question of law as to whether Rule 26 was in fact violated. That you would decide on a de novo standard and if and only if you decide that it was violated then you would get to the discretionary standard of whether the sanction was appropriate. I think it might be helpful for me to start with a timeline to put the events in sequence to show what we believe was compliance with Rule 26. The complaint in this action was filed in January of 2015. By April of 2015 Karum had disclosed a summary of its damages model, its opinions, the facts that would be part of that model. We had also disclosed that the person who would testify about that model and give opinion testimony was Peter Johnson, the CEO of Karum. But you did not disclose him as an expert at that point to testify, correct? You disclosed him under 701. That's right. We never mentioned 701 or 702. We simply said opinion. But Lowe's of they knew from reading it that it required opinions and we told them that the opinions would be disclosed by Mr. Johnson. Didn't you say though initially that as the business owner it would be lay opinion? So are you saying that they should have surmised it was expert because they had the model and could see it was complicated enough it would require expert testimony? We get ahead of ourselves just a little bit in the timeline, Judge. We didn't actually talk about 701 or 702 until two years later. All we said in 2015 was here's our damage calculation and the guy who's going to testify about it. And we used the word opinion. Admittedly we didn't say expert. We didn't say 702. We didn't say 701 either. Didn't you say lay though? Didn't you say lay opinion? We didn't say lay. We just said... Until two years later? Is that what you're saying? Two years later you said lay. But doesn't that suggest that for the entire two years preceding you had been kind of indicating and operating on the assumption that he would be lay? Actually, Judge, it wasn't us that said lay. It was the judge that said lay, the trial judge. We kept saying he's going to give opinion testimony. But the next time it actually came up, the next time we described him, was on April 12th of 2017. And at that point the judge said, and by the way the judge had had a pending summary judgment motion, he finally ruled on it and called us in for it. Up until that point, in the two years that had intervened, there was no date set for any kind of expert disclosure. There was no date set for expert discovery. There had been a fact discovery that had come and gone. And so the court pulled us in. Let me go back please to your initial disclosure in April of 2015 when you disclosed Johnson. You put him on your 26A1 disclosure list, correct? We put him in as a fact witness. And we did that in March. It wasn't until April. Of 2015. Right. Okay. So on April 12th, 2017, the judge called us in, said okay, where are we? And he raised the question, said where are we with expert discovery? Does Karam intend to have a retained expert? And we said to him, no Your Honor, Peter Johnson will be the witness. He's the expert. That was the We didn't say lay opinion. We simply said he's the expert. And the judge said, and again his actual words, all right. With that done, I will now order Lowe's to do its own 26A disclosures. I'll set a deadline for the deposition of the expert. We'll see if you want to do a rebuttal report. We'll come in for later status. We took from that exchange that the court accepted that we had made our order Lowe's to proceed to theirs. And so it never occurred to us that there was any gap. Shortly after that, we filed a revised damage model. And so Lowe's understandably said we don't know what it is that we need to respond to. And we need an extension of time for our expert to do whatever he's going to do so we know what we're responding to. The judge entered a general continuance of the intended in that until September, when the judge ruled that we could not file the revised damage model. And at that point, for the first time, he actually set some sort of discovery cutoff for expert disclosures. He told Lowe's that they had to make their disclosures by September 29th. The significance of all of this, Your Honor, is that there never really was a deadline for us to disclose. But before that, in June of 2017, didn't you include in your brief that Johnson was going to testify as a lay witness and not as an expert? And although you said he may qualify as an expert, you said he was going to testify as a lay witness. What we said, and Your Honor, if I had to do over again, I would have used different words, but what we said was he might testify under 701 or 702. No, I think you said he will testify. He's going to opine as a lay witness on the subject. He might qualify as an expert under 702, but you didn't disclose him as that. That was our language. We could have been more clear. And I had expected that somebody on this Court might say, well, why weren't you more clear? Why didn't you just fill out the piece of paper? I was wondering, so please tell us. It's a very good question. It's a question I wish somebody had asked me back in June or back in April or back at some other time, because if the question had been asked, I would have said, well, you're right. Why not? Let's just go ahead and do it. The simple answer is it just never occurred to us that given the exchange we had in April with the judge who said, okay, what have you done? We told him. He said, all right, now it's Lowe's turn. Now Lowe's has to make its disclosures. It did not occur to us that we had not satisfied Rule 26. It did not occur to us that Lowe's was not on notice that Peter Johnson was going to be the witness. Certainly they were on notice that he was going to be the witness, but it did not occur to us that it hadn't occurred to them that he would be giving expert testimony. I think you would agree that just disclosing someone as a fact witness doesn't qualify under Rule 26A2 for an expert. I'm painfully aware of the many cases this Court has issued that say exactly that. Not so aware back then, but I'm certainly aware now. But the thing is that when the federal rules want disclosures or documents to be done in a certain form, they know how to do it. Rule 10, for example, tells us what you have to do to have a pleading. If you want to file a complaint, it has to be called complaint. It has to have a title that says complaint. It has to be a numbered paragraph. It has to have a caption. It has to have the name of the court. There are no analogs to that for Rule 26. No magic words are required of Rule 26. There's no document required. There's no form of the document. What's required is two substantive disclosures and two procedural hurdles. The substantive disclosures are that the identity of the witness be disclosed. We submit that the identity was never in doubt from day one in 2015. They knew that we intended to have Peter Johnson be the witness. The substance was never in doubt. Since April of 2015, they knew that the 2015 model was what we planned to present as our damages, and after the summary judgment decision, half of that still survived. There were two components, a portfolio component and a services component. The judge decided that the services component could not stand, and that's a separate issue in this appeal, but the portfolio component stood. But counsel, let me interrupt and ask you this question. Lowe's said that had it realized that Johnson was going to be an expert witness, that it would need to get an expert witness of his own, that the deposition would have gone differently, and so that was part of the reason for Judge Lee's ruling, right? That it would require him to permit an entire another round of discovery. So could you respond to that? Well, first of all, in terms of they would have gotten a witness, they did get a expert witness retained, and when Lowe's appeared in September, the day after the judge had ruled against the revised model, which again is another issue in this appeal, the next day we appeared before him, and Lowe's stated to the court, Judge, we have a witness, still hadn't been disclosed, we didn't know who it was. We have a witness who hasn't done a report yet. He's been waiting to see what he should respond to, and now that we know, he's prepared to do it in three weeks. No problem there. So what we do know is that Lowe's didn't invest any time or effort going down a rabbit hole for the wrong purpose. But that was on the basis that they thought Johnson was going to give lay opinion testimony on the model. Well, wouldn't it differ if he's coming in as an expert? I guess the question I would ask back to answer your question, Judge St. Eve, is how would it have been different? They knew what the substance was. Their expert was retained to rebut the substance. But Rule 702 has different requirements for qualifications, gatekeeping requirements that they would want to explore with any kind of a rebuttal expert. They had had the damages summary for two years. If there was a problem with its methodology, if there was a problem with its conclusions, if there was a problem with the opinions, those were apparent and could have been addressed at any time. But isn't that part of the problem, that you can't tell methodology necessarily just from the report itself, that you need to depose the expert, find out what his actual methodology was, and without knowing who that expert was, they couldn't do that? But they did do it, Your Honor. But as a fact witness, not as an expert. Sure, but as a fact, the guys that prepared it, this was prepared under Johnson's supervision. He didn't do every input of data. He didn't actually create the Excel spreadsheets that actually manipulated the data, but it was done under his supervision. And Lowe's took 40 pages of testimony from him on that damaged model. They extensively examined him about that model. If they had a problem with the model, they could have raised it. Wouldn't you have had to have a Dalbert hearing about the model? I'm sorry, Your Honor. Wouldn't you have had to have a Dalbert hearing if he was going to present this You would have had to have a Dalbert hearing if they thought they had a legitimate basis to exclude the substance of the report. Dalbert doesn't usually go to, oh, this is a good report, but your witness doesn't have the right credentials. You don't need a Dalbert hearing. So you just assumed that they were perfectly fine with the methodology and the substance of the report? We know they weren't fine with it. We know that their expert took great exception to it and was able to take great exception to it. He had no problem coming up with 57 pages of critique. The point is that they knew how to attack it, and if they thought they had a Dalbert challenge, they could have done it any time in the two years that they had that report. But not if the witness isn't disclosed as an expert. The Dalbert challenge is for an expert witness. If it's a lay opinion, then you do what they did through a motion and eliminate. Your Honor, Dalbert challenges the speech, not the speaker. Dalbert is designed to challenge whether or not the methodology of an opinion is wrong, not that the person uttering it may not have the right credentials. But it has to be expert testimony. That's my point. Dalbert is reserved for expert testimony, not lay opinion testimony. Right, but the 2015 model by Lowe's Own Admission was something that was expert testimony. They knew, maybe they thought somehow we were going to come in and sandbag them with a last-minute disclosure of somebody, but if that was their fear, they could have said, no matter who presents this, here is the problem with the methodology. If they thought they had a legitimate Dalbert challenge, they could have brought it. Why didn't you disclose Johnson as an expert during his deposition? Again, Your Honor, it's the same answer I gave you before. God, I wish I had thought to ask myself that question. We wouldn't be here, we wouldn't be bothering you, we wouldn't have bothered the trial judge with it. It just did not occur to us. We thought that we had done what the rule requires. The rule requires that they know who the person is, and they knew it. They didn't have the label, but they knew it. The rule requires that they know what the opinion is. They had it from the 2015 model. The rule has two procedural requirements. But before you even get there, doesn't the rule require you to disclose it rather than have them guess? Well, again, we did disclose who he was. We called him an expert. In a footnote, admittedly, we say he might... Qualify, not testify, qualify. Sure, but qualification, of course, is for the trial judge. It's not for us to say he does qualify. Mr. Byman, before we eat too much into your rebuttal time, I do want to ask you a question about the services agreement. Did your client owe a termination fee regardless, and was the district judge operating under a misunderstanding about whether you actually were going to suffer damages or not? Yes, Your Honor. The judge did not focus, and perhaps we should have focused him better ourselves, but the services agreement does have a penalty clause in it. It's, if I can find the actual... I can... You can see that after our... I'll give you the site. But there is a penalty clause in it that says that if KCS reaches the agreement, it owes Karam L.A. the penalty, which is a calculation based upon the months remaining under the contract and the average of the services for the period of time. And so the district judge thought that you just didn't owe any money because your subsidiary was not performing any of these services for you, and thus there was no loss? That's our understanding of what he held. We think that was in error. You're in your rebuttal time. I see I am. I'm sorry, Judge Barham. You're in your rebuttal time. I am in my rebuttal time, and with the court's permission, I will reserve that. Thank you, counsel. Mr. Gilman. Good morning. May it please the court, Neil Gilman for Lowe's. I'd like to start with one, I think, crucial point, and that is that Mr. Bynum was talking about the April 12, 2017 hearing, and what he said was, we said that we were not going to have a hearing, and that because Mr. Johnson is the expert, but that's not what he said. And what he actually said is a crucial difference. I have that right here. It's in the supplemental appendix, page 42. The court, defendant, well, is plaintiff going to be offering an affirmative expert on damages? Mr. Bynum, no, your honor. The plaintiff will testify to it himself. This is consistent with the idea that throughout the entirety of this case, the judge and Lowe's believed that Mr. Johnson was going to be a lay opinion expert. Can I ask you a question about that? So was there, at some point, did it become clear that this just was not going to be something that was susceptible of lay opinion testimony, and you needed an expert? What caused, all of a sudden, this prompting? I mean, was everybody thinking this, he can give lay opinion testimony on this, and then suddenly everybody realized, no, this really requires an expert? No, your honor. What happened was, we were getting very close to trial. The trial, I think at this time, was scheduled for November, and we were filing our motions in limine, and one of the things we focused on was the damages. And we said, hey, this, they need an expert for these, these damages need expert testimony. So we filed a motion in limine saying, well, we said three things, basically. One is, this, this requires an expert to present this damage, because it's a whole series of projections and assumptions, you know, it's specialized knowledge under 702. They've only have a rule 701 witness, and that this is not rationally based on his perception. So there's a mismatch. So we filed a motion in limine. So were you kind of lying? Was it, seems to me then that maybe you realized, you had to realize you'd already deposed Johnson, so you realized that maybe expert testimony was going to be needed, that lay opinion testimony wasn't enough, and that maybe they had made a mistake, but it was a mistake that you could capitalize on by making a motion to exclude it close to trial. I mean, did you realize all along, well gosh, they've, they've made a mistake. This guy really should be an expert. Well, I think we were shocked, and I think Judge Lee said in one of his, in his hearings, he was very surprised that they were not going to present expert testimony on this issue. I wouldn't say we were, we weren't lying in wait. We took this deposition, you know, when you get close to trial, you start thinking, how is a trial going to go? What are the, who are the witnesses? What are they going to testify to? But we certainly never thought Johnson was their expert, because in his deposition, and the judge, and Judge Lee cited this as well on page A85, that's in the appendix A85, it's his November opinion, he cited a lot of Johnson's testimony about his, you know, about what he knew about the model, and there are a couple of provisions here where Johnson basically disavowed the model. He was asked at deposition, who prepared the model? Russell, Ushita, and myself, and then he said, well let me be specific. Russell had staff that were working for us, financial analysts, modelers, who are actually doing the work, but Russell, Ushita, and I, Russell had a primary role, and I had a secondary role in directing the work. So he also said that, he also in page 377 of his transcript, that it's a model, he was talking about Russell being a CFA, and Michael Johnson being a CFA, and then he said, so this is a model built by experts, and that was balanced against actual performance, and then he said, Russell Ushita supervised the building of the model. He had people working in his team, and then he mentioned some people that built the model, but he, meaning Russell, supervised it, and made sure it had integrity from a perspective. So we would never have understood that Johnson was an expert witness, and I think Judge Lee found this was easy. He said they paid consistently, and this is, I think, page 881 of the transcript, consistently stated that he would be a lay opinion witness. So, you know, I understand Mr. Byman's argument, because this is really, you know, a discretionary issue for the District Court, and I understand that Mr. Byman wants to make it a de novo issue, but I think the easiest question before this Court, not that the others aren't pretty easy, but the easiest one is that there was no Rule 26a disclosure. There was no disclosure of an expert. So all these questions that Mr. Byman raised go to the prejudice to lobes, and that is most, that is almost certainly a bad abuse of discretion. It is a bad abuse of discretion. What would have been the harm in extending expert discovery and moving the trial date? Well, Your Honor, I think that that could have been done, and I think in one of your cases, I think it's the Alcala case, I believe you actually did that in one of your cases, but that, but you made clear that that was within your discretion. The District Court here used his discretion in a different way. He said that it was, that it would have disrupted the trial, and that would have prejudiced lobes because we had prepared for the trial, and that's how he chose to exercise his discretion, which is totally in line with this Court's case law. The Muser case is right on point. That's exactly what happened in Muser, and the Salgado case also. Both of those cases, this Court affirmed sanctions of exclusion of witnesses when this, when that resulted in the dismissal of the case. You know, to say otherwise, and I think, I think it's Magistrate Judge Cole has a great explication on this in the Finwall case, which we cite. I'd love to read that, but I won't bore you with it, but it's in his decision, and it talks about how, you know, District Courts control their dockets. They control the timing of their cases. They control when the trials are, and for a party to come in and say, well, we violated the rule, but it really doesn't matter because, Judge, you could change your schedule just to accommodate us, is not the way the rules are designed to work, and I think, Judge, I think Judge Lee had the same, the same impression here. He wanted this Court, he wanted the case to go to trial. It was not able to go to trial as presented, and he used his discretion properly. Counsel, can you answer my question about the services agreement and the termination fee? Did Judge Lee misunderstand whether or not there was a penalty due? I don't think he misunderstood, Your Honor. What I think he was holding was that that contract and the penalty and all that, that is between, that's between KCS and and the, at Caroom LA. The focus of damages and what the damages need to be are what does Lowe's owe to KCS, if anything? Well, they're consequential damages, right? I mean, Lowe's can foresee, Lowe's is aware of the entire transaction, and this is a foreseeable consequence of Lowe's breach of the agreement, right? Well, there's a limitation liability that excludes consequential damages. In the contract? In the contract between Lowe's and KCS. So what they were trying to posit it as is direct damages, but what Judge Lee said was they're not damages at all. The damages are the money that Lowe's owes to KCS, and you know, if Lowe's owes KCS something, you might have to take into account amounts that Lowe's owes, that KCS would, might have to pay to Caroom LA, but those aren't the damages. They just wanted a straight pass-through from Lowe's to KCS, Lowe's to Caroom LA, and there was no contract between Lowe's and Caroom LA. So is your argument that these entities was essentially the right-hand paying the not, kind of as you've articulated it, like well Lowe's has washed his hands of that, and even if you owe some kind of termination charge that's on you? That's right, it's on them, but, and then they, we entered into a contract to pay money to KCS for certain things. KCS entered into a contract with Caroom LA to pay money for certain things. Whatever we owed to KCS could have been damaged, maybe it was lost profits, maybe it was something else, but that wasn't their damages model. Their damages model was somehow that we owed, we owed as a pass-through to Caroom LA, and I think the judge said no, those aren't your damages, and they chose, it was, they chose this services model. The other thing I would add, Your Honor, is that the services model, the services model they sought damages from, wasn't based on that pass-through, that pass-through payment, it was based on a whole series of assumptions as well, because, along with the portfolio component. So I think the judge probably found that those weren't, though the amounts that KCS had to pay to Caroom LA weren't damages to, weren't damages caused by Lowe's. The damages to Lowe's were, the damages caused by Lowe's, and I say this with reserving obviously that we didn't breach the contract. So, because, and I think what the judge said is, look, Caroom would have to, KCS would have to make those payments regardless whether Lowe's breached the contract. So they weren't the damages, the only way those become damages is if Lowe's owes KCS money, and that's clearly what he was holding. But wasn't KCS's argument that, but for the breach, they didn't, no, well, I don't think that was their argument because they had, they have a contract, they had to pay Caroom LA no matter what. Not a termination penalty though. Isn't this a separate thing? Well, but, but Caroom, KCS, we're still not aware that KCS terminated the contract with Caroom LA, right? They didn't, I mean, they didn't have to necessarily terminate the contract. They just owed them the money and they didn't have, they didn't have money coming in necessarily. But, but there's no, there was no termination, at least that I'm aware of, right? I mean, they didn't have to terminate and accept the penalty. They could have, they, they might have owed them money, that, that's also a possibility. But as the judge found, the damages that you have to focus on are the damages between Caroom, between Lowe's and KCS. And even if those, even if those are taken into account in how you calculate maybe KCS's lost profits, for example, because they might owe some money, those aren't the damages. And really what they were trying to do again, and I think the judge saw this, is, you know, right at the outset of the case, the judge, the judge dismissed the claim for breach of the services agreement. And I think he saw this as a backdoor way of trying to get, get to claim a breach of the services agreement. I'd like to also say, Your Honor, going back to the first issue, you know, Judge Lee clearly found that, that Caroom did not disclose Mr. Johnson as an expert witness. That is a finding of fact that's entitled to deference from this court under the abuse of discretion standard. He used the correct legal standard. This, we cite all cases on that. And his finding of fact certainly weren't clearly erroneous. In fact, I think they were obviously right. So the only question really before this court on that issue is, was Lowe's, is did he abuse his discretion in finding that Lowe's was prejudiced? And clearly we would have taken a very different deposition if we thought that Mr. Johnson was a, was supposed to be an expert witness. We would have taken him through every one of those cells in that Excel spreadsheet. We would have really honed in on it. We would have just accepted as, oh, I didn't do it. Someone else did it. Because even though an expert can obviously rely on other people, experts have to own their, their, their testimony, right? They can't say, well, I don't know anything about it, but I'm just going to assume it's right because somebody else did it. And that's what, that's what Mr. Johnson basically said. He didn't do it. So, so in, in that, so we would have taken a different deposition. And then what we would have done is we would have moved under Dauber. And I would call your attention to A85, which is also from the November transcript. And on that page of his opinion, the judge, the judge cites Johnson's deposition and says, look, you know, it seems pretty clear that even if they, even if they had disclosed Johnson, Johnson's not really an expert here. So obviously I'm going to have to let Lowe's file a Dauber motion. And all of that is going to, and it's going to disrupt the trial. And therefore, I, you know, and then, then they move for reconsideration. We haven't even, we haven't talked about that. And they, they proposed all these alternative sanctions. And what Judge, what Judge Lee did was he went through all of those alternative proposals and, and explained why those wouldn't work in the context of this case. They had this, you know, we'll dismiss our case and we'll, we'll refile it and start the case over. Well, obviously that would be hugely prejudicial to Lowe's. You know, then they had this bifurcation of liability and damages, which the judge thought was fundamentally unfair. And they had a two options. You know, one was to serve, certify an interlocutory appeal to this court. And the judge found all, you know, the other was to extend this, you know, just ignore the deadlines, pretend they didn't exist, and just go back into discovery. And Judge, Judge Lee found that all of those were unfair and that was within his, well within his discretion. And again, I point to the Mr. Feynman, rebuttal. So, Your Honor, first of all, I'd like to give you the site to the penalty provision in the services agreement, which is at ECF 50-3, it's clause 8.3. And it essentially says if KCS fails in any of its obligations, KCS shall pay KLA as a conventional penalty for such failure. And then it goes on to give the computation that would be used. And was there evidence in the record that KCS had failed in its obligations to Karoom LA? The allegation in the complaint and the amended complaint, Your Honor, was that with the termination of the relationship, with the funding agreement and the program agreement having been breached, with KCS being the only, the only client that KCS had was the Lowe's relationship. But putting that aside, and I'm sorry, I don't want to cut into your time here, the determination not to permit the service agreement damages was made at the end of the evidence when Judge Lee threw that out. So was there evidence in the penalty? It actually wasn't at the conclusion of the evidence. It was on summary judgment, a partial summary judgment motion, but yes. Was there evidence either way? Was there evidence to support it? We're not at the complaint stage anymore. The services agreement was one of the documents that was part of the summary judgment. So was there evidence to support that your client, KCS, had to pay Karoom LA, or had paid Karoom LA at that point, this penalty? Other than the existence of the penalty, no, Your Honor. At one point, I think Consul said that at no time did Johnson ever own the model. At no time was there ever any link between Johnson and the model, and I want to correct that. Again, this is something that we could have made more clear, but it was there right in the record. In one of the summary judgment briefs, Mr. Johnson submitted an affidavit in support of our opposition to summary judgment, and among the things that he swore to, and this is at ECF 96-1, he told the court what the damages Karoom was seeking were, gave the numbers, he said we're seeking something in the range of four and a half to nine million dollars, the exact numbers that were in the model. Now this was in a signed, sworn affidavit, and when he does it, he doesn't just say Karoom is seeking these numbers. What he says in the affidavit is, I estimate, based upon my review of all of the financials, all of the documents, everything on the record, I estimate that Karoom's damages are, and then he uses the exact numbers that are part of the model. In that sense, he certainly took ownership of the model. Mr. Byman, back to the services agreement, Judge Lee dismissed at the complaint stage your claim for damages under the services agreement, but he did so without prejudice, and you did not replead. Why didn't you try to replead that? Mainly, Your Honor, because there were several different ways to get at the same end, and we decided rather than try to convince Judge Lee of something that he already had formed an opinion on, we took a different path. The damages were the same, whether they belonged to Karoom LA, whether they belonged to KCS, whether they were measured as services or measured as costs. So we had four different ways that we could have sought that same pot of money. We decided to try a different way rather than convince the judge he was wrong. Again, in retrospect, maybe there was a better way we might have done it, but there was legitimate thinking, at least to that question. That was a question we asked you. I see I have only 20 seconds, and so I won't try to start a thought. We simply ask that you grant the relief that was asked for in our briefs. Thank you very much. Thank you, Mr. Byman.